Case No. 19-1139 POET Biorefining, LLC et al. Petitioners v. Environmental Protection Agency and Andrew Wheeler, Administrator Mr. Waxman for Petitioners, Mr. Salamenko for the Respondent Mr. Waxman, are you there? Mr. Waxman? Thank you, Your Honor, and may it please the Court The guidance in question imposes requirements that are nowhere found in and indeed are inconsistent with the EPA's 2014 regulation governing in-situ processing of cellulosic ethanol. Those new requirements are both reviewable and invalid. The regulation addresses methods for measuring the amount of cellulosic ethanol that is produced simultaneously with conventional ethanol. In recognition of the complexity of that subject and the absence of any standard means of reference, the regulation delegates to the judgment of outside experts validation of proposed methods. But the guidance upends that delegation, replacing deference to the expert judgment of peer reviewers and voluntary consensus standard boards with the mandatory application of a mathematical test, a test, moreover, that is literally impossible to perform. Let me explain. Under the guidance, a method of calculating the cellulosic converted fraction will no longer be accepted, even when peer reviewers certify that it would produce reasonably accurate results or when it accords with a VCSB standard. Now, acceptance is conditioned on proof that the method both measures cellulose directly and has, in fact, produced results that are within 20% of the known cellulosic content of a yet non-existent representative reference material. That is a stark departure. The reason that the 2014 regulation delegates to experts the scientific judgment that a method would produce reasonably accurate results is precisely because it is not possible to test a method against a known reference material because none exists. If such a representative reference material did exist, which is what the guidance posits, then peer review would be completely irrelevant. At a minimum, the imposition of these new mandatory requirements and, indeed, one that render irrelevant peer review or VCSB certification requires notice and comment rulemaking. But the guidance requirements are also patently arbitrary. EPA doesn't dispute that the reference material and demonstration requirements are currently impossible to satisfy, and the mass closure prohibition disregards the evidence before the agency and would foreclose methods that EPA's other new standards would permit. The guidance is plainly final agency action. The new reference material and demonstration requirements speak in mandatory terms, and even the other two new requirements, which EPA says are merely recommendations, set forth EPA's definitive views. The message to the industry is clear. Producers who fail to comply with the guidance are ineligible for RFS credits, and because the guidance so fundamentally upends the approach taken in the 2014 regulation, it is, in fact, a legislative rule. So this court, we pray, should grant the petition and vacate the guidance. All right. Thank you. Judge Garland, do you have any questions? Yes. Could we talk for a minute about the original regulation? Yes, Your Honor. All right. So the original regulation, I'm interested in the second part of it, or using a method that would produce reasonably accurate results as demonstrated through peer-reviewed references provided to a third-party engineer. You say that means that the third-party engineer gets the final say? Yes. Under the regulations, and in particular, what we've been discussing is Section 80.1450, I'm going to get this wrong, B.1. Romanet 13.B.3. Yes. Yes. I think Your Honor's question as to the third-party engineers is explained on the following page of the addendum to our opening brief. It's Section 14.52, and on pages 27 and 28, and I think 29, it talks about the role of the independent third-party engineer and the third-party engineer's responsibilities. What is the document you're discussing now? I'm sorry. Your Honor, this is the addendum to our opening brief, which is where we have the regulation reprinted. I have the regulation. What I'm asking is the regulation itself, which is sub-sub-sub-sub-3, says using a method that would produce reasonably accurate results, et cetera. Yes. Then what are you reading after that? So that is, you know, sub-sub-sub-B.3 is a sub to 14.51, but 14.50.2, which appears on the page immediately following what you just quoted me, says an independent third-party engineering review and written report and verification of the information provided pursuant to what you just read me shall be provided pursuant to this section. And then it goes on at great length to say what the engineer has to do in order to certify the application, including, and I'm quoting on page addendum, page 27, state whether the independent third-party agrees with the information provided and identify any exceptions between the independent third-party's findings and the information provided. So in other words, the responsibility of the applicant is to produce to the third-party engineer the proposed methodology, either a methodology that has been approved by a voluntary consensus standards board or a methodology. I understand. I want to focus only on the third-party engineer part. So when I look only at the rule itself, it says that would produce reasonably accurate results as demonstrated through peer-reviewed references provided to the third-party engineer. It doesn't say as decided by the third-party engineer. It says provided to. So the question is who it has to be demonstrated to. And what you just read me also says that the third-party engineer has to certify the EPA, the third-party engineer's view, but it doesn't say that the third-party engineer's view is final. I don't mean finality in the sense where otherwise. Yeah. Yeah. Right. So I think that there's, again, I apologize if I'm not directly responding to your Honor's question, but there is a difference here between, as to exactly what the delegation here, there's not a delegation either to the third-party reviewer, the peer reviewer, or the third-party engineer of the final decision-making authority. That is, the decision whether to grant or deny registration. The delegation to the peer reviewer here is the delegation of the scientific judgment that the proposed method, quote, would produce reasonably accurate results. That's exactly the question. So if you look at the rule itself, it doesn't say who decides. It says, or using a method that would produce reasonably accurate results as demonstrated through peer-reviewed references provided to the third-party. And certainly it seems to me a reasonable reading of that is that the company provides the references to the third-party engineer, who then does whatever review the engineer does. But whether it's reasonably accurate, there's nothing in the rule that suggests that it isn't EPA that makes that decision. Oh, I think it is. I think it's under the regulation, under the language that you've quoted me, a method is reasonably accurate if a peer reviewer, you know, a bona fide peer reviewer based on his or her independent judgment or a scientifically defensible. Yeah. I want you to read me the actual text that says what you just said. Well, it says that it's reasonably accurate, would produce reasonably accurate results as demonstrated through peer review references provided to the third-party engineer. It defines reasonably accurate through a procedure. And the point I'm trying to make here is that. I understand your point. What I'm trying to say is how the text supports the point. That is, if it said as demonstrated through peer reviewed references, as decided by the third-party engineer, you would be home. But all this says is provided to the third-party engineer. I think, I think it's perhaps useful judge Garland to, to compare the second prong, which I think you're doing with the first prong, which is you get all contrary to the guidance. If you use an analytic method certified by a VCSB, that's it. Okay. So now you're drawing the distinction between that and the requirement that using a method that a peer review reference demonstrates would be reasonably accurate. And the reason for the distinction between those two is that when a voluntary consensus standards body certifies a method, it is certifying that that method would produce reasonably accurate results. That's what a VCSB certification does. But because at the time of the 2014 regulation, there was no method that had been certified by a VCSB, the regulation goes on and says, well, we're going to also going to allow verification of reasonable accuracy through the provision of peer review. That is a bona fide peer review by a appropriately qualified expert. And what that person is going to do in his or her own capacity is essentially provide the kind of certification that VCSBs do. All right. Thank you, Mr. Waxman. I'm sorry for fumbling around so much, but that's my best answer. Thank you, Judge Henderson. All right. Judge Pillard. So, Mr. Waxman, can you explain a little bit more how the reference materials are used? Can you hear me? Am I off mute? You're off mute, but I'm not sure I heard your question. Right. So I'm curious about how reference materials are used. They're used to test a methodology. So if a reference material is designed to mirror the material that the producer is processing, then the reference material can be put through the same process to see what its results are and whether it takes you, on the concrete level, explain a little bit more how this all works. Sure. Could you describe it circular and sort of nonsensical, what the EPA was proposing? So I'm trying to get at least one level more concrete understanding. Okay. Let me try. So the in-situ coprocessing follows a method, which is the application of certain enzymes to both the corn kernel and the corn kernel fiber that encloses it, the casing of the corn kernel. And the determination for purposes of allocating the appropriate RINs is how much of the ethanol that is produced is produced from fibrous material and how much is produced from starch, the corn kernel. Now, if there were a material that everybody agreed as to what the true value of that material, what the true value of the fiber content of the material was, you could take a method, you know, we're going to use these enzymes and we're going to go through all these steps, and we can show you that this is a reasonably accurate way of allocating RIN, the RIN assignments, by applying this method to a material that everybody agrees will reflect the actual true value of the fiber content. And as EPA points out in its brief, it gives, as an example, a reference material that is used in order to test methods of certain fuel additives. In that instance, there is a representative reference material that everybody agrees has very specific, each component of the fuel additive is known precisely. And so if you're going to use a methodology to test whether a new product is a fuel additive or not, you simply apply it to that reference material and you do a mathematical calculation. The problem here is that in 2014, and indeed now, there is no representative reference material that EPA, that anybody has ever identified that gives the precise true value of the fiber content. And I get it at that level of generality. I'm sorry. I'm sorry for interrupting, but you have the example of orange juice and Gatorade. And it seems like if this thing in the field that you're trying to test for, you know, whatever, it's sugar content or vitamin C content, is orange juice. How could like Gatorade, which as you point out is easier to precisely know its content, how could that be a reference material for orange juice? So, okay. Now I understand that I had to work through this myself too when I was first writing the brief in this case. So if you have something that is, if you will, the gold standard reference material, we know precisely what the sugar content is of Gatorade. Now, somebody produces something called orange juice. Well, there is orange juice. It's naturally occurring. And you have to come up with some method. Tell me the methodology, Mr. Chemist for determining the sugar content of this orange juice and show me why your methodology will accurately calculate how much sugar is in this batch of orange juice or that batch of orange juice. Because you have a known reference material that everybody agrees gives you the true sugar content. You can say, well, EPA or FDA, the way I'm going to test and certify the sugar content of my orange juice and grapefruit juice and prune juice is using the following methodology, the Waxman methodology. And the Waxman methodology is accurate because if you use, if you use the Waxman methodology to test Gatorade, it comes up with the actual true value. Does that? Yeah, it gets closer, although I thought here the problem was somehow the relationship between the starch and the fibrous material. And if there's a relationship between the two, that leads to sort of impedes the, the use in the conversion to fuel of the fibrous material. And if your artificial reference material doesn't have that structure, it's going to, it's just not going to give you, it's not going to unlock the mystery. Isn't that the EPA? I mean, EPA can speak for itself, but more or less part of their objection. So, so this is, this is their objection to, to the use of a reference material that is synthetic. That is, that does not naturally occur in nature. That is really a sideshow here because the, the principal point is that EPA is now saying that we are not going to, we are essentially rendering either revoking or rendering irrelevant. The delegation that the regular regulation made to peer reviewers to applying their expertise and whatever methodologies and carbohydrate chemical analysis they do to certify that the method would produce reasonably accurate results. Now we will require that, that the methodology be demonstrated to have come plus or minus 25% of the known value of a representative reference material, which is antithetical to peer review. And in any event, everyone agrees naturally occurring or synthetic. There is no reference material and it is ipso facto arbitrary and capricious and unreasonable to impose a Are there, how many producers since the 2014 memorandum have been able to register through peer review? So that information, I don't know that information. And I think to the extent that I can give you an estimate, it would rely on some extrapolation from material that is sealed in the record. I can tell you this, that EPA has readily conceded that between 2016 or 2000, the promulgation of the 2014 regulation and the denial last year of our, the application for our Hudson facility, it had approved several facilities that use in situ coprocessing, even though it acknowledges that there is no accepted representative reference material. And therefore, and there, and there also has been no approved VCSB method. And so they all were approved by the, you know, by having a peer, one or more peer reviews certify that the method would produce reasonably accurate results and an agreement by the third party engineer. And do you know what the status is of the other methods discussed in the 2014 memorandum, the structural carbohydrate analysis or the detergency fiber analysis? Are those methods that are available to estimate cellulosic converted fraction? So those, those methods which are discussed in the docket memo that accompanies and explains the 2014 regulation are in fact different methods of doing exactly what poet has done. Those are the various ways in which you can apply principles of carbohydrate chemistry in order to evaluate the amount of ethanol that has been produced from fiber. And, and you know, our facilities, you know, use some of those methodologies as well. There are all ways of indirectly measuring using forms of mass closure, the amount of ethanol that is produced from the fibrous content of the corn kernel. So the EPA is current. I mean, we can ask them, but their current view on mass closure would put those off limits also. Yes. I mean, they, they say that it is with respect to mass closure quote, it is not possible for an analytical method designed to focus on starch or some other non-cellulosic component to yield reasonably accurate results. That is exactly the opposite of what the docket memo says at JA page 101. Thank you. All right. Mr. Waxman, your time is up. Let me ask if Judge Garland has any follow-up questions, and if not, we'll give you some time in rebuttal. I just have one question on the finality issue from national mining. What do you do with this language from Judge Kavanaugh's opinion in national mining? As plaintiffs see it, EPA will not issue the permit unless its recommendations are followed. But by, but while regulated parties may feel pressured to voluntarily conform their behavior because the writing is on the wall about what would be needed to obtain a permit, there has been no order compelling the regulated entities do anything. But what do we do with that language? Yeah. Thank you, your honor. So national mining and this court's decisions in California communities and the decision last month in Sierra club all involve the finality of statements made by EPA in the context of the title five, the clean air act title five permit process in which, which is an exercise of cooperative federalism, where the, the actual regulating parties are the state permitting authorities and in national mining, as in California communities and Sierra club this. And again, I'm quoting here from national mining, the state authorities are quote, free to ignore close quote, EPA statements, the court in national mining judge, then judge Kavanaugh also pointed out that the guidance in that case, quite contrary to what we have here was devoid of mandatory language. And that it had never been applied in any particular context as binding, which of course is the opposite of what we have here, because on the very day that guidance was issued here, EPA also denied our application for our Hudson facilities using precisely the same reasoning and indeed very much of the same language that the guidance imposes. So here we, here we really have a situation in which the EPA directly determines whether we can or can't get this permit. The guidance is in mandatory terms and it has already in fact been applied to deny an application. So the relevant, the most relevant precedents, I think judge Garland from this court are the GE case, the Appalachian power case and the national environmental development association case where, and again, I'm just, I'm just quoting the GE decision quote, a document will have practical binding effect if affected parties are reasonably led to believe that failure to conform will bring adverse consequences such as denial of an application. That is not only what we have precisely here, but we also know that the guide, the principles announced in the guidance are in fact being used by EPA to deny applications. Thank you. Thank you. Thank the court. All right. Mr. Salamaka, if you would go ahead with your three minute opening statement. Yes, ma'am. Thank you. And may it please the court. There are, the guidance is not final. It does not bind EPA. It does not present itself as binding and it does not determine any rights or obligations. It is therefore not actionable under section 307. In addition, even if the guidance were final, which is not the case, it is simply an interpretive rule. And as such is not subject to notice and comment. Finally, if the guidance were final, which again, is not the case, it is not arbitrary, capricious or contrary to law and therefore should be upheld to elaborate Congress charged EPA to ensure that each category of application is as accurate as it is. And the rule requires producers, such as petitioner, to demonstrate to EPA that their methods would produce reasonably accurate results. And in this regard, I believe my friend misapprehends the links in the chain. There are, in fact, four links in the administrative chain. The first link, of course, is the producer. The second link is the peer reviewers. The third link is the engineer. And the fourth link is EPA. A natural construction of the rule, which I will shorthand as 13B3, is that the demonstration is to EPA. It is through peer reviewers who provide their documentation to the engineer. And if you look at the preamble that supports the Pathways to Rule, I'm not sure, Your Honors, if you have the preamble in front of you, but if you look at the preamble at 79 Federal Register 42133, you'll see that the independent professional engineer actually has a very limited role. His or her role is to verify that the equipment to perform each of the relevant unit processes is in place. So it's a highly limited, it is the last step in the chain before EPA, but it's highly limited. The natural grammar of the rule is that EPA is the arbiter of whether there has been sufficient demonstration. Not only is that the natural grammatical interpretation of the rule, it also is the only interpretation of the rule that's consistent with the trajectory of the statute. At the end of the day, the emperor has to have clothes. Each category of renewable fuel has to be what it says it is, otherwise Congress's purposes in enacting the statute aren't being served, and the demonstration needs to be made to EPA. The problem arose because EPA became aware of high variability in the data. I turn the Court, if it will, to page 48 of our brief where we discuss that, and this is part of the brief, Your Honors, that's sealed, so I can't read from it, but if you look at page 48 of our brief, pages 4 through 11, you will see that. And in light of that high variability, EPA engaged various stakeholders on that precise issue, which led to a request by various stakeholders, including petitioner, that EPA provide clarification of its views, which in turn led to the guidance. But the guidance is nothing but EPA's understanding of what the statute is. It does not bind EPA. It does not speak in terms of binding anyone else, and it does not determine any rights or obligations, and therefore it is not final or actionable. There are six points that Mr. Waxman made that I think I'd like to respond to precisely. Well, forgive me, it's only three or four, actually. First of all, Mr. Waxman suggests that we have, in fact, denied the Hudson permit, and that is not true. If you look at the so-called Hudson letter, which is in the record, it neither grants nor denies the application for the permit, and, in fact, there is a separate application, I'm told, pending as of April 10th for the Hudson facilities. That's not quite accurate. Secondly, EPA never said that mass closure is not possible in so many few words. We said that we believe it is not possible. And finally, I'd like to respond to the implication that a representative reference material is impossible to make. Scientists, in fact, make representative reference materials all the time, including in this kind of context. We refer to this process on page 40 of our brief, where we cite to an article by John Taylor, Dr. John Taylor of the National Institute of Standards and Technology. This is called a round-robin process. Scientists gather in several separate laboratories, and they build on each other's works, and they approach by consensus the material that they need. EPA will concede that if you go to this article and try to read the relevant paragraphs, they are scientific and complex, and even Dr. Taylor concedes that the process is tricky and involves trial and error, but it is a normal process. And I return to the point that I started with early in my presentation, and that is that the emperor, at the end of the day, has to have clothes. In other words, EPA is charged under the statute and charged under the rule with ascertaining or being demonstrated to that, in fact, cellulose is being turned into ethanol. And at this point, there is no evidence. There is no conclusive evidence that cellulose, in fact, is being turned into ethanol, and that is why EPA is engaging producers, such as Petitioner, to undertake these strategies. EPA has identified three specific strategies in the guidance that it sees as components of the best path forward. They are control groups, trial runs, and analytical methods that do not magnify margins of error. When I say control group, that's a nickname for a representative reference material. It's a standard aspect of the scientific method. It shouldn't be a surprise to anyone that in a context where we're seeing highly variable data, EPA is identifying that as an important component. A trial run, similarly, is a standard component of the scientific method. Again, it shouldn't be surprising that EPA sees that as an important part of the path forward. And mass closure, because of the substantial margin of error in the measurement of starch, at this point does not look like a promising analytical method. The problem there is because given the extent to which starch dominates the mass of corn, any margin of error in the measurement of starch, if transferred to the imputed measurement of cellulose, would be greatly magnified. If starch is 70 percent of corn and we have a 2 percent margin of error, that means that the actual percentage could be anywhere from 68.6 to 71.4 percent. But if you take that same swing and transfer it to the much smaller cellulosic component, you end up with a swing of 70 percent, which gives rise to the concern about the mass closure method. Mass closure is an indirect way of measuring cellulose, not by measuring cellulose directly, but by measuring starch and then assuming that the agricultural or organic content other than starch must be cellulose. EPA identified that as problematic because of those margins of error and that magnification. And advocating a control group and trial runs and avoidance of analytical methods that magnify margins of error are simply useful and well-advised components of the scientific method. There's nothing in the guidance that is not embedded in the rule and as well as the statute from the beginning, both the statute and the rule necessarily entail use of the scientific method. And EPA simply invoked the scientific method to address the high variability that it's seeing in the data. All right. Thank you. Judge Garland, do you have any questions? Yes. If a permit were submitted without a reference material, the guidance says there must be a reference material, right? The guidance says it does – I don't have it memorized, Your Honor, but it says something like it's inherent in the process. Right. So if a guidance is submitted without a reference – I'm sorry, guidance – if an application is made without a reference material, under the guidance it would be rejected. Is that right? I don't think that under the guidance would be the right way to put it. I would say, Your Honor, that at this point in time, given the state of the technology and what EPA is seeing, if an application for registration were submitted that did not include trial runs on the basis of a representative reference material, it would quite likely be denied or quite likely be – Why do you say quite likely? Isn't the whole point here that it would be denied? Well, Your Honor, I honestly don't know. This is May 11, 2020, and the guidance was written on May 7, 2019. In response to requests by stakeholders for a clarification of EPA's views, I think it's highly likely that that would still be true a little over a year later. It seems to me, given – At least then for the period of time right after the guidance was issued, isn't the guidance final as to that point? EPA – the guidance is – I'm not saying – leave aside whether it's a interpretive rule or a policy statement or whatever. Isn't it final? Isn't that your final position as of that moment in time, that you won't grant an application that doesn't have a reference material? Your Honor, with respect, I disagree on – perhaps you and I are seeing it very slightly differently. I'm only asking a question. I'm not seeing it at all. Okay. In real time, last May, it looked to EPA like it was not possible to make – there was no path forward that did not involve a representative reference material. I cannot speak definitively to what was true a day later. We're talking about, if you will, one line on a function, and I can tell you what the derivative at that one point –  and I can't tell you what the slope was the next day. Given the logic of the situation, it is highly likely that the next day the same thing was true. But the guidance does not present itself as final or binding or conclusive. Let's try the 20% rule. Is that going to change over time? I think the 20% rule probably is the most amenable rule to change. My impression is that the 20% rule was adopted or identified as a sort of relaxed standard to give producers a fairly wide target to hit. And so I think that of the four components of the guidance, I think that's the one that's the most up in the air. And I think the second most up in the air one – You can't imagine somebody coming in at 30% and being accepted, can you? Well, I'm not a scientist, Your Honor. I don't know. I'm asking – you have a guidance that says you have to come within 20%. We regard that as generous, and it certainly sounds incredibly generous. Yeah. But my question is, is it final? It's not final. It is not final. Is it final in the sense that you won't get this RINs if you don't fall within that amount? Well, the exact language of the guidance, it's in the same paragraph, I believe. We say that we evaluate every application on a case-by-case basis. And that phrase actually appears more than once in the guidance, as does the phrase that this is our current view or our current understanding. So I don't know for sure. I'm only saying that the 20% number strikes me, just reading our defense of it, as the one that's most amenable to change. All right. You don't have any doubt that when the guidance says the decision is up to the EPA and not up to the third-party expert, that's final, right? Or not? You mean the legal conclusion, Your Honor? Yeah. You're interpreting your regulation and you say that, is it not part of the guidance that the EPA will decide the reasonableness question? Your Honor, that was true in 2014 when EPA promulgated the Pathways to Rule itself. I think that it was already obvious from the language. In 2019, EPA was simply repeating something that was already true. In addition, if the way the guidance presents itself in terms of trial runs and control groups and so on, if all of that is merely advisory, then the underlying logic is also advisory. In a manner of speaking, if a case has no holding, it also is 100% dictum. I'm sorry, I'm following an analogy here. Well, if the- Let me just ask. Okay. Can you imagine any circumstance in which a request would come in and the agency would not think that it, in the end, has to decide whether it's reasonably accurate? I see your point, and I think that that particular legal conclusion is something that we firmly represent, and it's in our brief, so we don't walk away from that. My answer to you, Your Honor, is that that's in the rule, and it's not new to the guidance. So if it was final, it was final back when the rule was published and not now? Yes, sir. I see. Okay, thank you. Thank you, Judge Anderson. All right. Judge Pillard? Good morning. Good morning. I'm, again, also trying to probe the finality question, whether the guidance has consequences. And in the 2014 rule and memo, the agency said that starch measurement could be used, and the guidance now says calculations based on starch reference values alone cannot ensure that resulting estimates of cellulosic conversion are reasonably accurate. It seems that that puts an obligation on producers to make a different showing than they had to show, because that's what they argue, a different showing than they would have had to show before the guidance. And your position on that, again, is? Your Honor, I'd like to alert the Court or point out to the Court the language in the preamble to the rule from 2014. On footnote 12 of the preamble, we say that a mass balance approach... Can you point to a page in the appendix or the addenda so we can read along with that? I'm not sure it's in the... Okay. I think it's in our brief, and that may take me a minute to find. I'm very sorry. Excuse me for one minute. This is 789 Federal Register 42128. Is that what you're referring to? 42132, Your Honor. Page 8 has a reference to 42132. Page 8 of EPA's brief, Your Honor? Right.     Page 8 of EPA's brief, Your Honor. Page 9 also. Yes. So, looking at page 8 of our brief, and I apologize, Your Honor, for fumbling on that, in the Pathways to Rule, EPA did not require or endorse any particular methodology. Rather, the agency explained that it believed it is reasonable to require the use of the grant existing methods under certain circumstances. And those certain circumstances, Your Honor, is a reference to situations in which the reporting, recordkeeping, and so on requirements of the rules are maintained. I'm sorry to interrupt, but I think further down just before the heading about the 2019 guidance, you say a mass balance approach which meets the requirements discussed below is an appropriate method. So, you're saying that the original 2014 apparent endorsement of a mass balance approach had a caveat that it also had to meet other requirements. And those requirements in particular for registration, recordkeeping, and reporting, it seems a little circular since this is trying to describe what would meet the requirements for registration. Well, the requirements for, well, registration is not a one-time thing in a complete sense. One registers, and then one has recordkeeping and reporting requirements. And if, in the context of keeping records and making reports, it becomes apparent that one's cellulosic converted fraction has fallen off, then EPA engages you on what seems to be going on and your CCF is readjusted and so on. So, it's an ongoing interactive process between incumbent registrants and EPA. The implication here is that, yes, we are identifying mass balance and so on as potentially feasible approaches, but subject to their continued compliance with what the Renewable Fuel Standard Program requires. So, this is not a blanket prospective permission for people to adopt whatever method they want, no matter how accurate or inaccurate it is, or no matter how reasonably accurate the results are that it produces or not. Is there anything in public record that you can point to that shows EPA skepticism before this guidance of reliance on mass balance? The specific data that underlies our conclusion is under seal, Your Honor. And, again, you can turn to page 48 of our brief. You can also turn to page 10 of our brief. On page 48, from lines 4 through 11, we identify and give you some of that information. It is under seal. And it also is on page 10 from line 5 to line 3 through line 13. We are aware of a substantial amount of data from a substantial number of sources. And if the Court would like, we could have another hearing that's closed, and we could say more on the record. No, I'm not trying to probe into any closed material. Yeah. Did EPA make available for public comment any of the scientific data? I gather not. Was it the Monte Carlo study or the other data observations that underpin this guidance? The guidance did not go out for notice and comment, Your Honor. We don't think the guidance is final at all for the reasons that I've identified. It doesn't bind anyone. It doesn't bind EPA and so on. Even if it were final, which we don't think is the case, it would simply be an interpretive rule. So it wouldn't need to go out for notice and comment. In a manner of speaking, we showed our work on the Monte Carlo simulation. If you look at the guidance and look at the appendix at the end of the guidance, you can see all of the values, and you can see all of the charts, and you can even see the code. I'm not enough of a mathematician, actually, to have run it all. I am enough of a mathematician that I pressure tested it with my own fingertips. The most operative moving part in the Monte Carlo simulation, if you look at the guidance, the most operative part in the Monte Carlo simulation is the margin of error for the cellulosic, excuse me, for the carbon, excuse me, for the starch figure. It's plus or minus 10% at the post end, and that's what causes all the problems. Right. Understood. Okay. All right. Judge Garland, do you have anything? He's over his time. I mean, Mr. Salamanca, just, Garland, do you have any follow-up questions? I don't. Thank you. All right. And Mr. Waxman, why don't you take a couple of minutes in response? I'm sorry, Judge Henderson. I think you were cut off. All right. Why don't you take two minutes and rebuttal? Okay. Thank you. Just a couple of points. Number one, the representative reference material requirement that Judge Garland was asking about at the outset is plainly now mandatory. It's mandatory by its terms. EPA's own brief doesn't deny that that requirement and the demonstration requirement are mandatory, and they were the basis for what was the denial of the Hudson application. A representative reference material, whether it is naturally occurring or synthetic, does not exist. EPA asked NIST three years ago to help it come up with some representative reference material. It has not done so yet. There is no prediction when it will or if it ever will produce something, and what EPA is now saying in its guidance is it is a requirement, and actually in their Eighth Circuit brief they said that it amounts to a pause in the registration provision because a requirement that is the actual demonstration of the method against a representative reference material, which doesn't exist, is a requirement, and therefore we are pausing its term in the Eighth Circuit. We are pausing approvals. Now, that requirement that you comply with a new test that doesn't exist is by definition arbitrary and capricious, but in any event, EPA plainly has a new view about what it is going to require. It is not going to be satisfied with the certification of a peer reviewer and a third-party engineer, and it has to engage in notice-and-comment rulemaking if it's going to change the requirements for registration. You say it's by definition arbitrary and capricious to impose a test that can't be met, but that must be the case in all kinds of regulatory arenas. I mean, we want to cure for cancer, but it can't be done yet. So what are you relying on? I mean, where should we look for that in our case law or in administrative law generally? Well, it's all – look, you can't deny a government benefit unless the person provides a cure for cancer. That is an arbitrary and capricious and unreasonable requirement. I think probably the best articulation of this, at least the one that I remember as I'm standing here now, is your decision in the – I think it was the Alliance for Cannabis Therapeutics case that was decided, I don't know, seven or eight years ago, that specifically said, quote, impossible requirements imposed by an agency are perforce unreasonable. Now, just one other point with respect to this, and that is Mr. Salamanca's reference to the – I guess it's two points – our requests for guidance, which is supposedly what produced this guidance. This is the single most galling aspect of this case. They have, in their brief, made this assertion and supported it by reference to a single document in the joint appendix. I believe it's page 1240, but don't hold me to it. You ought to look at that document to test their assertion that industry is seeking guidance. What that document is is a back and forth. It is a string of email communications between POET and the EPA in which POET is basically saying, with respect to the Hudson facility, we have satisfied the regulation. We have provided you not one, not two, but five peer reviewers. We don't understand what it is more that has to be done. And that is the so-called request for general guidance. It's an exchange between an applicant for registration and the authority saying, we don't understand what part of this regulation we haven't met. Now, Judge Pillard, your question about the Monte Carlo simulation goes to Mr. Salamanca's point that there's just too much variability in these methods. Number one, if that's true, and that is certainly EPA's current view, that is a reason for having a notice and comment rulemaking to have a new regime. It is not. You cannot say that something is not a peer review unless the peer reviewer does a specific test, indeed a test that doesn't exist. And, indeed, in the record in this case, EPA, the Monte Carlo simulation says, if you take a bunch of hypothetical numbers and you run this sort of random sample, it turns out that some results are nonsensical. We provided data, which in the Hudson letter the agency acknowledges, that our method has reduced the variability in the results from the application of our method to well within the tolerances that EPA accepts. I know that I've gone over my two minutes, and I apologize. Mr. Waxman, let me interrupt with a question here. This is to think a little bit more about your impossibility argument. So the statute, I take it, I don't have the wording exactly, says you'll get certain RINs if you produce cellulosic ethanol. Is that right? Yes. Yes, more or less. Yes. So let's take it to be true for purposes of this hypothetical that there is no way to prove that you've produced cellulosic ethanol. Are you saying that a rule that says you have to prove that that's what you produced is arbitrary and capricious? As I understand your question, the answer would be obviously not. That's right, obviously not. So the question is, why isn't that what's going on here? The text of the statute is that you're only going to get the RINs if you show that you've produced cellulosic ethanol. And the agency believes that, even if you're right, again on the hypothetical, that there is no current method for proving it. So, yes, it's impossible, or the method you're using is impossible, or all the methods currently available are impossible. Why is that arbitrary and capricious? So I think if the EPA – the EPA is quite contrary to the 2014 rulemaking, and I'll point to the very same page in the Federal Register that the court was questioning Mr. Salamanca about. If the contrary to the 2014 regulation, which is predicated upon a finding by EPA that there are available methods that will, with reasonable accuracy, produce the cellulosic converted fraction, if EPA is now of the view that none of the current methods do that, and that the only way it can be done is by applying a mathematical test to a known, accepted reference material, that's a new rule. It has to engage in a notice-and-comment rulemaking. Why is that a new rule rather than a reevaluation of the existing evidence? It is. Assume for the moment that you lose the argument that the regulation leaves it up to the peer reviewers. Assume just for the – unless you think you lose the whole case. Is your position that you would lose the whole case if we were to conclude that the regulation says it's to be provided to the experts, but that EPA will decide whether it works? Would your position lose the whole case if we reach that conclusion? No, no, not at all. I mean, the point is – All right, so assume that you lose that point, okay? What about that rule would prevent EPA continuing to evaluate and to concluding that the evidence it has is not enough to show that you've produced cellulosic ethanol? Well, the EPA, in the guidance and in the Hudson letter, candidly acknowledges that there is now a second-stage determination. That is, yes, you have to provide a peer reviewer and the engineer has to – No, Mr. Westman, I'm asking you to assume that we agree with EPA on this second-stage thing and agree that that's been the rule all along. I know you're against that just for purposes of hypothetical. I'm testing what you need to even have a partial victory or whether that is the end of the ballgame. But every time you repeat that point suggests to me that if we make that conclusion, then you've lost the whole ballgame, not just part of the ballgame. The point is that the – assuming that I've lost this first part of the ballgame, which breaks my heart to consider, but I accept it. Assuming that – I understand it and I'm not taking it personally. I'm trying to be very professional about this. The point is that there is now a new and exclusive test for satisfying EPA. There's no doubt that it is new, and there is no doubt, again, that it is inconsistent with what peer review is. But the fact that it is new, we now – EPA previously said, okay, we're going to accept, you know, we're going to register – In the effort to move this along because we're running out of time, assume now – this will not break your heart – that it is new. You still made the argument that it's arbitrary and capricious because it's impossible. Yes. That's the only question I'm trying to get at. Okay. Why is it arbitrary and capricious if it's impossible? I got it. I got it. I got it. Okay. If, in fact, it is impossible. Right. If and when EPA promulgates this as a new rule, we will show that it is arbitrary and capricious because, in fact, it is not impossible. In fact, it is quite possible. And, in fact, we have demonstrated accuracy, a significant level of accuracy, in our Hudson application. So that's my argument. I'm not saying – So you're not saying that just because EPA sets a certain standard and it's impossible to meet, that that's arbitrary and capricious? I am saying – Your argument is that there is a reasonable standard that is not impossible to meet. I'm actually saying both. I'm saying that if you – yes, maybe it's a little bit of both. If you are in a world in which there are reasonable standards that could be applied that are possible of being met, which is what we have here, it is arbitrary and capricious and unreasonable to say, nope, we're not going to accept any of those methodologies, no matter how strong a showing you make that they do, in fact, produce reliable results. All right. So that's different than what I would say is the rather harsh rule. I thought you were originally – the rule of law you were proposing, which is if EPA, as to 100 percent certainty, concluded that there is no existing test that will show that you produce cellulosic ethanol, and therefore that it's impossible to meet the requirements of proving it, that that would be arbitrary and capricious. You are not taking that position, correct? That's right. Our position with respect to that hypothetical is – the forthright version of what they're doing is just to say, based on all of our recent experience, we are no longer satisfied that there is any method that could ever be demonstrated as sufficiently accurate, and we are canceling pathway two. They can do that, but they have to do it by notice and comment rulemaking. Okay. Thank you. I have the argument. Appreciate it. Thank you. Thank you. All right. Thank you, counsel. And, Madam Clerk, would you please call the next case?
judges: Henderson, Garland, Pillard